FILED
2021 Jun-11  PM 03:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **ERIC LEWIS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 2:19-cv-00832-AMM** |
| | ) |
| **HUBBLE POWER SYSTEMS,** | ) |
| **INC.,** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM OPINION ON DEFENDANT'S MOTION FOR**
**SUMMARY JUDGMENT**

This case is before the court on Defendant Hubbell Power Systems, Inc.'s

("Hubbell") Motion for Summary Judgment. Doc. 32. For the reasons explained

below, the motion is **GRANTED**.

## I.    BACKGROUND

The undisputed facts material to Hubbell's motion are as follows:

Eric Lewis began work at Hubbell in 2010 as a grinder and material operator.

Doc. 34-1 at 9. In 2015 or 2016, Mr. Lewis was promoted to group leader, in which

position he was responsible for delegating tasks handed down from his supervisor.

Doc. 34-1 at 10; Doc. 34-2 at 108; Doc. 34-7 at 6–8. On April 30, 2018, while

working for Hubbell, Mr. Lewis was involved in an incident with another forklift

driver in which Mr. Lewis's and the other employee's forklifts made contact. Doc.

34-5 at 16–17, 34–35; Doc. 34-7 at 20. That day, Mr. Lewis also transported four containers with a forklift. *See* Doc. 34-1 at 18, 21–22; Doc. 34-3 at 2–18; Doc. 34-6 at 33; Doc. 34-7 at 20–21. On May 8, 2018, Mr. Lewis's employment was terminated by Hubbell. Doc. 34-2 at 108–09. The Disciplinary Action Form memorializing Mr. Lewis's termination provides that "[f]ollowing an investigation into this incident[, Hubbell] determined that [Mr. Lewis] . . . operat[ed] a forklift in an unsafe manner and endanger[ed] the welfare of other employees while engaged in an altercation with another forklift driver," and that Mr. Lewis's "conduct [wa]s unacceptable and a violation of the Work Rules and safety policies." *Id*. at 108.

Hubbell "maintains Safety Rules that all employees and forklift operators are expected to follow." Doc. 41 ¶ 54; Doc. 49 ¶ 54; Doc. 34-2 at 9–11. Likewise, Hubbell's Work Rules apply to "all employees, no matter their position or job title." Doc. 41 ¶ 50; Doc. 49 ¶ 50. Hubbell's Safety Rules contain a section on Lift Truck Safety, which section provides that forklift drivers should "[n]ever carry more than three (3) hoppers . . . ." Doc. 34-2 at 9–10. Further, Hubbell's Work Rules provide that Hubbell may take corrective action in response to certain employee conduct, including creating or contributing to unsafe conditions, violating safety rules, driving recklessly, and failing to perform assigned duties in an acceptable manner. *Id*. at 18–20. Under the Work Rules, Hubbell's potential corrective actions are listed in seven steps, which steps include verbal warnings, written warnings, suspension, and

discharge. *Id*. at 20. The Work Rules further provide that "[d]epending on the severity of the offense[, Hubbell] may start or advance Corrective Action in Step #1 through Step #7 of the disciplinary progression as deemed appropriate." *Id*.

At the time of his termination, Mr. Lewis's direct supervisor was Humberto Hernandez. Doc. 34-1 at 10–11; Doc. 34-2 at 108. The incident was reported to the Operations Manager at the time, Tom Quinn, Doc. 34-5 at 5; Doc. 34-6 at 10, who signed the Disciplinary Action Form memorializing Mr. Lewis's termination, Doc. 34-2 at 109. Charis McLaren, a Human Resources manager at the time Mr. Lewis was terminated, informed Mr. Lewis of his termination during a phone conference on May 8, 2018. *See* Doc. 34-1 at 33–34; Doc. 34-2 at 109; Doc. 34-5 at 16; Doc. 34-7 at 3. Ms. McLaren also signed Mr. Lewis's Disciplinary Action Form memorializing the termination of his employment. Doc. 34-2 at 108–09.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the party moving for summary judgment establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). If the moving party has carried its burden, Rule 56 requires that the nonmoving party "go beyond the pleadings" and establish that there is a material fact in genuine dispute. *Celotex*, 477 U.S. at 324–25; *see also* Fed.

R. Civ. P. 56(c)(1)(A). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (internal quotation marks omitted). A material fact is in "genuine" dispute if a reasonable jury could return a verdict in favor of the nonmoving party. *Id.*

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (citation and internal quotation marks omitted).

## III.   ANALYSIS

Mr. Lewis alleges that Hubbell violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e *et seq*., as amended by the Civil Rights Act of 1991 ("Title VII") when it terminated Mr. Lewis's employment "because of his race." Doc. 1 at 6–8 and ¶ 44. In his complaint, Mr. Lewis describes the April 30, 2018 forklift incident as follows: After Mr. Lewis "picked up four empty containers on his forklift and began driving the forklift in the proper direction," another Hubbell employee "drove his forklift and blocked [Mr. Lewis] in order to take two of the [four] containers." *Id*. ¶¶ 9–10. Mr. Lewis then "attempted to proceed past [the other forklift driver] and avoid [him], but [the other driver's] forklift bumped into [Mr.

Lewis's] forklift." *Id*. ¶ 11. The other driver then "grab[bed] two [of the four] containers off the top of [Mr. Lewis's] stack," so Mr. Lewis "loaded two more empty containers and . . . quickly drove away." *Id*. ¶¶ 13–14.

Mr. Lewis alleges that following that forklift incident he was "treated . . . differently from other white employees involved in forklift accidents" because Hubbell terminated him without allowing him "to be retrained or recertified." *Id*. ¶¶ 42–43. Mr. Lewis alleges that Hubbell "has not terminated any white employees for forklift accidents[, and] . . . has retrained . . . and recertified white employees after a forklift accident that resulted in damage." *Id*. ¶¶ 32–33. Mr. Lewis also alleges that "[n]o other employee has been disciplined at that plant for carrying four empty containers" or "containers that were not perfectly level." *Id*. ¶¶ 36–37.

Under Title VII "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). When "a plaintiff relies upon circumstantial evidence to support [their] discrimination claim," the Eleventh Circuit "analyze[s] it according to the familiar burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1288 (11th Cir. 2018). The *McDonnell Douglas* framework is not the only way to prove a claim of discrimination, *see Lewis v. City of Union City*, 918

F.3d 1213, 1220 n.6 (11th Cir. 2019) (en banc), but the parties present their arguments solely under that framework.

Under the *McDonnell Douglas* framework, the plaintiff "bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that [they] belong[] to a protected class, (2) that [they] w[ere] subjected to an adverse employment action, (3) that [they] w[ere] qualified to perform the job in question, and (4) that [their] employer treated 'similarly situated' employees outside [the plaintiff's] class more favorably." *Lewis*, 918 F.3d at 1220–21 (citing *Holifield v. Reno*, 115 F.3d 1555, 1561–62 (11th Cir. 1997)). To establish the fourth element of a *prima facie* case of discrimination, the plaintiff "must show that [they] and [their] comparators are 'similarly situated in all material respects.'" *Id*. at 1226; *see also Knox v. Roper Pump Co.*, 957 F.3d 1237 (11th Cir. 2020). If the plaintiff establishes a *prima facie* case, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Lewis*, 918 F.3d at 1221. If the defendant carries its burden, "the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination." *Id*.

Mr. Lewis has satisfied the first three elements of a *prima facie* case of discrimination. *First*, Mr. Lewis asserts, and Hubbell does not dispute, that "as an African American male, [he] is a member of a protected class." Doc. 41 at 25; *see also* Doc. 51 at 21–27. Accordingly, based on his race, Mr. Lewis belongs to a

protected class under Title VII. *See* 42 U.S.C. § 2000e-2(a)(1). *Second*, the parties do not dispute that Mr. Lewis was terminated from his employment with Hubbell, Doc. 51 ¶ 9 and Doc. 41 ¶ 9, and termination is an adverse employment action, *see Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020) ("'[T]angible' or 'adverse' employment actions . . . consist of things . . . like terminations, demotions, suspensions without pay, and pay raises or cuts . . . ."). *Third*, Mr. Lewis asserts, and Hubbell does not dispute, that he "was qualified to do his job" as a jolt molder and group leader, which position included the responsibility of forklift operations. Doc. 41 at 25; Doc. 51 at 6 ¶ 7, 21–27. Hubbell also does not dispute that Mr. Lewis was promoted to group lead around 2015 or 2016, Doc. 41 ¶ 43; Doc. 49 ¶ 43, remained as a group lead until his termination on May 8, 2018, *id*., and obtained a three-year forklift training certification on January 29, 2016, Doc. 41 ¶ 47; Doc. 49 ¶ 47. *See* Doc. 34-1 at 10; Doc. 34-2 at 22–23, 108; Doc. 34-7 at 6–8. Accordingly, Mr. Lewis was qualified to perform his job.

The parties dispute whether Mr. Lewis has established the fourth element of a *prima facie* case. Mr. Lewis argues that "[a] sufficient comparator exists," Doc. 41 at 26, and he offers five comparators: (1) John McCombs, (2) Brett Morgan, (3) David George, (4) Stacy Williams, and (5) Gerald Burdette. Doc. 1 ¶¶ 26–28; Doc. 41 at 27–33. In order to meet his initial burden of establishing a *prima facie* case, Mr. Lewis must show that at least one of those alleged comparators is "similarly

situated [to him] in all material respects." *Lewis*, 918 F.3d at 1226. Hubbell argues

that "[n]one of the potential comparators . . . were similarly-situated" to Mr. Lewis.

Doc. 51 at 26. Mr. Lewis argues that Hubbell "treated white employees more

favorably by offering white employees the opportunity to be retained and recertified

on the forklift after committing more egregious offenses that could have and did

endanger the welfare of other employees," and "further treated white employees

more favorably than [Mr.] Lewis by allowing forklift safety violations to go

unreported, undocumented and uninvestigated." Doc. 41 at 25.

 "[A] plaintiff proceeding under *McDonnell Douglas* must show that [they]

and [their] comparators are 'similarly situated in all material respects.'" *Lewis*, 918

F.3d at 1226. This standard must be applied "on a case-by-case basis, in the context

of individual circumstances." *Id.* at 1227. "Ordinarily, . . . a similarly situated

comparator . . . will have engaged in the same basic conduct (or misconduct) as the

plaintiff . . . ; will have been subject to the same employment policy, guideline, or

rule as the plaintiff . . . ; will ordinarily (although not invariably) have been under

the jurisdiction of the same supervisor as the plaintiff . . . ; and will share the

plaintiff's employment or disciplinary history." *Id.* at 1227–28 (internal citations

omitted). It is not "necessary for a plaintiff to prove purely formal similarities—*e.g.*,

that [they] and [their] comparators had precisely the same title[,] . . . [n]or will minor

differences in job function disqualify a would-be comparator." *Id.* at 1227. Examples

of "employees who are differently situated in material respects" include those "who engaged in different conduct, who were subject to different policies, or who have different work histories." *Id*. at 1228 (internal quotation marks omitted). "An employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects' . . . ." *Id*.

In *Lewis*, the plaintiff, "an African-American woman" who was working as a detective for the city police department, asserted race and gender discrimination claims against the city following her termination, *id*. at 1218–20. The plaintiff suffered a heart attack a year after she was promoted to detective "but was [ultimately] cleared to return to work without any restrictions." *Id*. at 1218. Following her return, the police chief "announced a new policy requiring all officers to carry Tasers," and provided a "training associated with the new policy" that required officers to "receive a five-second Taser shock." *Id*. The plaintiff's doctor informed the police chief that she "would not recommend that either a Taser or pepper spray be used either on or near [the plaintiff]." *Id*. at 1219 (internal quotation marks omitted). The police chief "concluded that the restrictions . . . prevented [the plaintiff] from performing the essential duties of her job," and placed the plaintiff "on unpaid administrative leave." *Id*. After the plaintiff "had exhausted all of her accrued leave," but had failed to "complete[] the necessary FMLA paperwork," her

absence was deemed unapproved and she was terminated pursuant to a city policy providing that unapproved leave of absences are grounds for dismissal. *Id*.

The Eleventh Circuit adopted and applied in *Lewis* a new test for determining whether the "similarly situated" requirement under *McDonnell Douglas* framework is satisfied: Are the plaintiff and her/his alleged comparator "similarly situated in all material respects"? *Id*. at 1226 (internal quotation marks omitted). The Eleventh Circuit found that the plaintiff in *Lewis* failed to make out a *prima facie* case of discrimination because her proffered comparators were not "similarly situated in all material respects." *Id*. at 1229.

The Court observed that the plaintiff "and her comparators were placed on leave years apart and pursuant to altogether different personnel policies and . . . for altogether different conditions." *Id*. at 1230. Specifically, the comparators were placed on leave pursuant to the police department's "Physical Fitness/Medical Examinations" policy, which was not issued until two years after the plaintiff was terminated. *Id*. By contrast, the plaintiff was discharged pursuant to the city's "Personnel Policy." *Id*. Further, the comparators "flunked physical-fitness requirements related . . . to 'balance' and 'agility,'" and "were placed on leave . . . to remedy the problems that caused their failures." *Id*. By contrast, the plaintiff "failed a training requirement . . . on the ground that she suffered from . . . a 'chronic' heart condition." *Id*. Accordingly, the court held that "because they were subject to

different personnel policies and placed on leave for different underlying conditions," they "were not similar to [the plaintiff] 'in all material respects,' and thus were not valid comparators." *Id*. at 1231.

The Eleventh Circuit applied *Lewis* in *Knox v. Roper Pump Co*., 957 F.3d 1237 (11th Cir. 2020). In *Knox*, the plaintiff, "an African-American man and quality test technician [for the defendant] for fifteen years, got into a fight with his adult daughter . . . at their shared home." *Id*. at 1240. The plaintiff's daughter worked in the same facility he did, but worked for one of the defendant's "affiliated companies." *Id*. After the fight occurred, the plaintiff's daughter complained to the defendant's human resources department, and the plaintiff was suspended from work "[b]ecause violence against a coworker violated [the defendant's] workplace violence policy." *Id*.

After his suspension, the plaintiff complained to the defendant's employee ethics hotline "that he believed he was being discriminated against on account of race because white employees who had violated the workplace violence policy had been allowed to continue working." *Id*. The defendant then told the plaintiff that "he could keep his job if he completed anger management classes while on unpaid leave," and sent him a written Last Chance Agreement that included a release of all claims against the defendant. *Id*. at 1240, 1242. The plaintiff refused to sign the agreement unless the release was removed. *Id*. at 1240. The defendant refused to

remove the release and fired the plaintiff. *Id*. Following his termination, the plaintiff sued the defendant and its affiliated companies for retaliation and race discrimination in violation of Title VII. *Id*. The district court granted summary judgment on the plaintiff's race discrimination claim "because [the plaintiff's] proposed comparators were not sufficiently similar," and the Eleventh Circuit affirmed. *Id*. at 1244, 1248.

The plaintiff had provided three alleged comparators—a white employee who "was not disciplined after a domestic violence incident with [his] [ex-]wife," and two other white employees who "got into a violent altercation at work and were permitted to continue working with pay while they attended anger management classes." *Id*. at 1247. The court observed that the first comparator's "ex-wife was not and had never been an employee of [the defendant] or any other . . . subsidiary" of the defendant. *Id*. Accordingly, the court found that he was not similarly situated because, "although he was involved in a domestic violence incident outside work, the altercation did not involve one of [the defendant's] employees." *Id*. The court observed that the other two comparators "were involved in a fight at work," which "violated [the defendant's] workplace violence policy." *Id*. Unlike the plaintiff, "[b]oth men were immediately terminated," and "[n]either was offered a[] [Last Chance Agreement] initially." *Id*. However, "[w]eeks after their termination," the defendant rehired them "out of business necessity" and permitted them to work

"while attending anger management courses." *Id*. at 1247–48. Accordingly, the court found that "their immediate termination and subsequent rehiring out of necessity undermine [the plaintiff's] claim . . . that they were similarly situated in all material respects." *Id*. at 1248. Finally, the court observed that the incidents involving the proffered comparators "all occurred under different supervisors," which is "still another meaningful distinction." *Id*.

In determining whether a comparator is similarly situated in all material respects, the court must consider whether the defendant's decision-makers in the plaintiff's case knew about the comparator's misconduct and "the known violations [by the comparator] were consciously overlooked." *Jones v. Gerwens*, 874 F.2d 1534, 1542 (11th Cir. 1989); *accord Holley v. Georgia Dep't of Corrs.*, 845 F. App'x 886, 889 (11th Cir. 2021) (citing *Jones*, 874 F.2d at 1542). In *Jones*, the Eleventh Circuit held that a *prima facie* case "must show that" the supervisors who disciplined the plaintiff were aware of the comparators' misconduct "and that the known violations were consciously overlooked," and that evidence of a comparator's supervisor's "previous tolerance" of misconduct is "relevant only if it could be shown that" the decisionmakers who disciplined the plaintiff "knew of such practices and did not act to discipline rule violators." *Jones*, 874 F.2d at 1542. In *Holley*, the Eleventh Circuit described *Jones* as setting forth a "principle . . . that a

proffered comparator's misconduct is relevant only if the decisionmaker knew about it." 845 F. App'x at 889 n.2.

Bound by these legal standards, the court analyzes each of Mr. Lewis's five proposed comparators in turn:

### 1. John McCombs

John McCombs, Jr., who is white, was an employee at Hubbell who, according to Mr. Lewis, had multiple (more than five) incidents in which he failed to comply with company rules and policies regarding forklift safety. Doc. 34-1 at 27–29, 32–33, 40; Doc. 34-5 at 23. Mr. McCombs had two documented forklift incidents within four days. Doc. 34-5 at 35–36; Doc. 34-6 at 45–46, 56–59. These two incidents resulted in a Corrective Action Notice issued by Humberto Hernandez, Mr. McCombs's supervisor at the time. Doc. 34-6 at 45. In that notice, Mr. McCombs was issued a written warning for his violation of Hubbell's Work Rule III.D.(12), which rule permits corrective action for an employee's "[f]ailure to perform assigned duties in an acceptable manner." *Id*. The notice provided the following description of the specific violations: "[O]n 9/9 [Mr. McCombs] hit [a] rack with a stand up forklift[.] . . . On 9/13 [Mr. McCombs] was on a forklift and struck a hopper into a table which ultimately struck another employee." *Id*. The Incident/Accident Investigation Form for the September 13, 2016 incident provides

that Mr. McCombs was "[o]perating equipment unsafely," and that the fundamental cause of the incident was his "[n]ot following safety rules." *Id.* at 57, 59.

The Corrective Action Notice further provided that, following the September 9, 2016 incident, Mr. McCombs was given a "drug screen" and "retrained." *Id.* at 45. The Incident/Accident Investigation Form for the September 13, 2016 incident further provided that the immediate corrective action was to "[t]ake [the] license from operator for an unspecified time period and issue a write up and give[] a drug/alcohol screening"; the short-term corrective action was to "[e]nsure the area ha[d] adequate room to maneuver [a] forklift safely"; and the long-term corrective action was to "[r]etrain [Mr. McCombs] prior to [his] operator status reinstatement." *Id.* at 58–59.

Sometime after those two forklift incidents, Ms. McLaren was informed of the incidents by another employee. Doc. 34-5 at 24. Ms. McLaren then investigated the incidents and determined that Mr. McCombs falsified his subsequent forklift recertification training. *Id.* Mr. McCombs was then terminated for falsification of his recertification paperwork. *Id.*; Doc. 34-6 at 46. Ms. McLaren did not know of Mr. McCombs's previous forklift incidents prior to her investigation. Doc. 34-5 at 20, 24.

The form memorializing Mr. McCombs's discharge was issued by Ms. McLaren. Doc. 34-6 at 46. It is undisputed that Mr. Lewis was Mr. McCombs's

group lead, and that their supervisor at that time was either Mr. Kasebier or Mr. Hernandez. Doc. 34-1 at 32–33; Doc. 34-5 at 24. Hubbell's environmental health and safety manager at that time was Alicia Yarbrough. Doc. 34-1 at 48; Doc. 34-4 at 65.

Mr. Lewis asserts that Mr. McCombs "was engaged in the same basic misconduct" as Mr. Lewis—"violating safety rules and operating a forklift in an unsafe manner." Doc. 41 at 28; Doc. 34-2 at 108; Doc. 34-6 at 57. He further asserts that Mr. McCombs's actions "amount[ed] to a clear disregard of safety and work rules and could and did seriously endanger himself and other employees." Doc. 41 at 29. Further, Mr. Lewis asserts that Mr. McCombs was "subjected to the same employment policies" as Mr. Lewis. *Id*. at 27. Additionally, Mr. Lewis asserts that Mr. McCombs is a proper comparator because fell within the "same supervisory chain of command" as Mr. Lewis. *Id*. at 33.

Here, like in *Lewis*, Hubbell's disciplinary actions in response to Mr. Lewis's and Mr. McCombs's incidents occurred years apart. *Lewis*, 918 F.3d at 1230. Mr. McCombs's documented misconduct involving forklifts occurred in September 2016. Doc. 34-6 at 45. Mr. McCombs was issued a written warning for his two documented forklift incidents on September 15, 2016, *id*., and he was ultimately discharged for falsifying his forklift recertification training on September 22, 2016,

*id*. at 46. Mr. Lewis's misconduct involving forklifts occurred on April 30, 2018, and he was subsequently discharged on May 8, 2018. Doc. 34-2 at 108.

Mr. Lewis has not established which of Hubbell's rules and policies were applied to him after his forklift contacted another forklift, nor has he established that such rules and/or policies are the same as the one applied to Mr. McCombs following his two forklift incidents. The Corrective Action Notice regarding Mr. McCombs's two documented forklift incidents specifically names the Work Rule that he violated—"III.D.(12) – Failure to perform assigned duties in an acceptable manner." Doc. 34-6 at 45. The Incident/Accident Investigation Form regarding Mr. McCombs's second documented forklift incident provided that he "[o]perat[ed] equipment unsafely" and was "[n]ot following safety rules," but that form does not state any other specific rules or policies that he violated in addition to Work Rule III.D.(12). *Id*. at 57. Mr. Lewis's Disciplinary Action Form regarding his forklift incident provided that he "operat[ed] a forklift in an unsafe manner" and "endanger[ed] the welfare of other employees while engaged in an altercation with another forklift driver" in "violation of the Work Rules and safety policies," but it does not state the specific rules that Mr. Lewis violated. Doc. 34-2 at 108.

Further, in this case, unlike in *Lewis*, undisputed evidence demonstrates that at least one rule applied to Mr. Lewis was not applied to Mr. McCombs. Mr. Lewis's statement of additional undisputed facts provides that "[t]he safety rules indicate that

employees should carry no more than three hoppers; however, no one, other than [Mr.] Lewis and [the other African American forklift driver involved in the April 30, 2018 incident], has been disciplined for violating this policy." Doc. 41 ¶ 77; *see also id*. ¶ 55; Doc. 49 ¶ 55. Hubbell does not dispute this implied admission by Mr. Lewis that the Safety Rule providing that forklift drivers should "[n]ever carry more than three (3) hoppers" was applied to him following the April 2018 forklift incident. Doc. 49 ¶ 77; Doc. 34-2 at 10. Accordingly, at least one of the rules Mr. Lewis was subjected to in response to his lifting four containers on his forklift is not the same rule applied to Mr. McCombs following his two documented forklift incidents.

Mr. Lewis also has not established that he and Mr. McCombs participated in the same basic conduct or misconduct. *See Lewis*, 918 F.3d at 1227–28. Mr. Lewis's and Mr. McCombs's misconduct is similar in that they were both involved in forklift incidents, but the forklift incidents are dissimilar. Mr. Lewis's basic misconduct involved transporting more containers on his forklift than is permitted by Hubbell's Safety Rules, as well as his forklift contacting a forklift that was in use by another employee. Mr. McCombs's basic misconduct during his two documented incidents involved hitting a rack with his forklift, and striking a hopper into a table, which table then contacted another employee. Mr. Lewis asserts that "[i]t is undisputed that [Mr.] McCombs had more than five forklift incidents including the following: falling asleep on the forklift causing the load carried to run into a pole; hitting the

woodworking machine with the forklift; hitting the guard rail by the mens [sic] restroom; operating a standing forklift that he was not licensed to operate; hitting the belt guard with the forklift," Doc. 41 ¶ 86, and Hubbell disputes the assertion that Mr. McCombs had over five forklift incidents, Doc. 49 ¶ 86. In any event, even viewing the disputed facts in the light most favorable to Mr. Lewis, none of the alleged incidents involving Mr. McCombs involved an overloaded forklift or a forklift that made contact with another forklift. In other words, Mr. McCombs's forklift contacted inanimate objects, while Mr. Lewis overloaded his forklift and contacted another forklift that was being driven by another employee.

Although Mr. Lewis and Mr. McCombs share some employment and disciplinary history, their histories are dissimilar in several respects. Their similarity is that, at some point before Mr. McCombs's termination in September of 2016, Mr. Lewis and Mr. McCombs were in the same department, where Mr. Lewis was Mr. McCombs's group leader and they shared the same supervisors. Doc. 34-1 at 32–33; Doc. 34-5 at 24. And both Mr. Lewis and Mr. McCombs operated forklifts. The record also reflects that Mr. McCombs and Mr. Lewis each received only one disciplinary notice for their respective forklift incidents—Mr. McCombs received a Corrective Action Notice in response to his two forklift incidents in September 2016, *see* Doc. 34-6 at 45, and Mr. Lewis received a Disciplinary Action Form in response to his forklift incident in April 2018, Doc. 34-2 at 108.

The dissimilarities are that Mr. Lewis began working for Hubbell in 2010 as a grinder and material operator, and in 2015 or 2016 he was promoted to group leader. Doc. 34-1 at 9–10; Doc. 34-2 at 108, Doc. 34-7 at 6–8. At the time of his forklift incident and discharge in 2018, Mr. Lewis was part of the BMM Molding Department and held a group leader position. Doc. 34-2 at 108. According to Mr. McCombs's two Disciplinary Action Forms, at the time of his documented forklift incidents and termination, Mr. McCombs was part of the Brass Grinding Department and a foundry specialist. Doc. 34-6 at 45–46. Mr. Lewis has not established that these dissimilarities are purely formal, and not material.

Further, after Mr. Lewis's 2018 forklift incident, his disciplinary form provided that he was "discharged" for "operating a forklift in an unsafe manner and endangering the welfare of other employees while engaged in an altercation with another forklift driver." Doc. 34-2 at 108. After Mr. McCombs's 2016 forklift incidents, Mr. McCombs's disciplinary form makes no mention of an altercation or of another forklift driver; Mr. McCombs's form provided that he was issued a "[w]ritten [w]arning . . . as a result of 2 [forklift] incidents in 3 working days." Doc. 34-6 at 45.

As with their employment and disciplinary history, Mr. Lewis's and Mr. McCombs's supervisors at the time of their forklift incidents overlap in some ways and differ in others. It is undisputed that on the date of Mr. Lewis's forklift incident,

certain employees first reported the incident to the Senior Human Resources Representative, Sarah DeFanti, who started an investigation. Doc. 34-1 at 22–24, 30; Doc. 34-6 at 10–11; Doc. 34-7 at 20–21. Ms. DeFanti and the Operations Manager, Tom Quinn, then spoke with Mr. Lewis and informed him that he was suspended without pay while a further investigation was conducted by Ms. McLaren, who was out of the office on April 30, 2018. *See* Doc. 34-1 at 22–24, 26, 30; Doc. 34-2 at 108–109; Doc. 34-5 at 4–5; Doc. 34-6 at 10–11; Doc. 34-7 at 4, 20–21. After Ms. McLaren's investigation, she discharged Mr. Lewis in a phone conference on May 8, 2018. Doc. 34-1 at 26, 33–34; Doc. 34-5 at 16. Further, Tom Quinn was the manager who signed the form memorializing Mr. Lewis's termination. Doc. 34-2 at 108–09; Doc. 34-5 at 16; Doc. 34-6 at 10. Although Humberto Hernandez was Mr. Lewis's supervisor at the time of the forklift incident and instructed him to go to the office after that incident, the record does not reflect any other involvement by Mr. Hernandez in Hubbell's response to the incident. Doc. 34-1 at 10, 22–24, 46.

At the time of Mr. McCombs's documented forklift incidents, Humberto Hernandez was his supervisor. Doc. 34-6 at 45, 59. Mr. Hernandez issued the written warning for such conduct. *Id*. at 45. As reflected in the incident form involving the second documented forklift incident, Brandon Partain and Alicia Yarbrough were the persons responsible for taking corrective action against Mr. McCombs in response to that incident. *Id*. at 58–59. Mr. Quinn's name was also provided on that

incident form in a section titled "Other," but the form does not indicate his involvement in Hubbell's response to that incident. *Id*. Further, it is undisputed that Ms. McLaren did not know of Mr. McCombs's documented forklift incidents until an employee told her about them and she began an investigation. Doc. 34-5 at 20, 24; Doc. 34-6 at 46. Ms. McLaren's investigation uncovered that Mr. Combs falsified his forklift recertification training, for which conduct he was terminated on September 22, 2016. Doc. 34-6 at 46.

There is no dispute that Ms. McLaren, who was the decisionmaker regarding Mr. Lewis's termination following his forklift incident, was unaware of Mr. McCombs's misconduct until she began her investigation into his falsification of recertification training. Doc. 34-5 at 20, 24; *see also* Doc. 41 at 29 ("It is undisputed that McLaren lacked knowledge of any of McCombs' forklift incidents prior to her investigation . . . ."). Because Mr. Lewis does not dispute that Ms. McLaren was unaware of Mr. McCombs's forklift incidents, Mr. McCombs's misconduct is inapposite. *See Jones*, 874 F.2d at 1541–42 (holding that a *prima facie* case of discrimination requires a showing that the relevant decisionmakers were aware of the proffered comparators' misconduct and that such misconduct was consciously overlooked); *see also Holley*, 845 F. App'x at 889 ("[A] proffered comparator's misconduct is relevant only if the decisionmaker knew about it.").

Further, there is no dispute that Mr. Hernandez, who was the decisionmaker about Mr. McCombs's written warnings following his two forklift incidents, was not involved in the corrective actions taken by Ms. McLaren in response to Mr. Lewis's forklift incident. Doc. 34-1 at 22–24, 33–34, 46; Doc. 34-2 at 108–09; Doc. 34-5 at 16; *see also* Doc. 41 at 35 ("Lewis' testimony [is] that Hernandez would not have any knowledge of the incident on April 30, 2018 beyond asking Lewis to report to the office."). Likewise, Ms. McLaren testified that she was unaware of the corrective actions taken by Mr. McCombs's supervisor, Mr. Hernandez, in response to his forklift incidents. Doc. 34-5 at 20.

Although Mr. Lewis and Mr. McCombs shared at least two of the same supervisors at the time of their forklift incidents (Mr. Hernandez and Ms. McLaren), Mr. Lewis cannot show that Ms. McLaren treated Mr. McCombs more favorably after his forklift incidents because she was unaware of those incidents, nor can he show that Mr. Hernandez treated Mr. McCombs more favorably because Mr. Hernandez was not a decisionmaker regarding Mr. Lewis's termination. Accordingly, Mr. McCombs is not a valid comparator for Mr. Lewis.

## 2. Brett Morgan

Mr. Morgan, a white man, was involved in an incident in which his forklift mast struck a roll up door when he attempted to drive thorough it. Doc. 34-6 at 60. Mr. Morgan was not disciplined or terminated in relation to this incident. Doc. 34-5

at 36–37. Ms. McLaren did not investigate this forklift incident and did not have any personal knowledge of the incident. Doc. 34-5 at 18, 36.  The Incident/Accident Investigation Form documenting this incident provided that Mr. Morgan's supervisor at the time was Beth Schuler, and the individual reporting the incident was Alicia Yarbrough. Doc. 34-6 at 60. The form also provided that, at the time of the incident, Mr. Morgan was part of Hubbell's Shipping Department and was working as a forklift operator. *Id*.

Mr. Lewis asserts that Mr. Morgan's "operation of a forklift in an unsafe manner is similar misconduct . . . cited for Lewis' termination and is sufficient to show a valid comparator." Doc. 41 at 30. He further asserts that Mr. Morgan's conduct was "in violation of Defendant's Safety Rules," which "require that forks be raised no more than six inches while the forklift is in motion." Doc. 41 at 29–30 (citing Hubbell's Safety Rule II.b.(6)). Although Mr. Lewis admits that Ms. McLaren did not have any personal knowledge of Mr. Morgan's forklift incident, Doc. 51 ¶ 41; Doc. 41 ¶ 41, Mr. Lewis asserts that Ms. McLaren "was aware of Morgan's incident [but] she did not complete the investigation," Doc. 41 at 30. Further, Mr. Lewis asserts that Mr. Morgan "was not terminated or issued any corrective discipline but instead was given the opportunity to be recertified." *Id*. Mr. Lewis asserts that, "[a]lthough Morgan could have seriously injured himself or

others during this incident, Morgan was treated more favorably than Lewis because Lewis was not given the opportunity to be recertified on the forklift." *Id*.

The analysis of whether Mr. Morgan is a valid comparator for Mr. Lewis yields the same result that the analysis of Mr. McCombs as a comparator yielded. Mr. Lewis has established that all employees at Hubbell were subjected to Hubbell's general Work Rules and Safety Rules, *see supra* at pp. 18–20, but he has not established that he was subjected to the same rule or policy that was applied to Mr. Morgan. Although the Incident/Accident Investigation Form for Mr. Morgan's forklift incident does not state a specific rule or policy that was applied, Doc. 34-6 at 60, Mr. Lewis suggests that Safety Rule II.B.(6), which prohibits forks from being "more than six inches off the floor when the truck is moving," Doc. 34-2 at 9, was applied to Mr. Morgan, *see* Doc. 41 at 30. Mr. Lewis does not show that Safety Rule II.B.(6), nor any other rule or policy, was applied to both Mr. Morgan and himself following their respective forklift incidents.

Mr. Lewis's and Mr. Morgan's misconduct is similar in that they were both involved in forklift incidents, but the facts underlying those forklift incidents are dissimilar. Mr. Lewis's misconduct involved transporting more containers on his forklift than is permitted by Hubbell's Safety Rules, as well as his forklift contacting a forklift that was in use by another employee. Mr. Morgan's misconduct involved his forklift mast striking a roll up door.

Although Mr. Lewis and Mr. Morgan operated forklifts and each received only one disciplinary notice for their respective forklift incidents, Mr. Lewis has not shown that Mr. Lewis and Mr. Morgan shared the same employment and disciplinary history. For example, Mr. Lewis and Mr. Morgan were not in the same department— Mr. Lewis was part of the BMM Molding Department and held a group leader position at the time of his forklift incident, *see* Doc. 34-2 at 108, and Mr. Morgan was part of the Shipping Department and held a forklift operator position at the time of his forklift incident, *see* Doc. 34-6 at 60. Mr. Lewis has not established that these dissimilarities are purely formal, and not material.

Finally, Mr. Lewis and Mr. Morgan did not share the same supervisors. At the time of Mr. Lewis's forklift incident, Mr. Hernandez was Mr. Lewis's supervisor. On the day of the incident, Ms. DeFanti and Mr. Quinn suspended Mr. Lewis without pay while a further investigation was conducted the following day by Ms. McLaren. Doc. 34-1 at 22–24, 26, 30; Doc. 34-2 at 108–09; Doc. 34-5 at 4–5; Doc. 34-6 at 10–11; Doc. 34-7 at 4, 20–21. After Ms. McLaren's investigation, she terminated Mr. Lewis's employment with Hubbell. Doc. 34-1 at 26, 33–34; Doc. 34-5 at 16. Conversely, Ms. McLaren did not investigate Mr. Morgan's forklift incident, nor did she did not have any personal knowledge of the incident. *See Jones*, 874 F.2d at 1542; *Holley*, 845 F. App'x at 889. Unlike Mr. Lewis, Mr. Morgan's supervisor at the time was Beth Schuler, and the individual reporting the forklift incident was

Alicia Yarbrough. Accordingly, Mr. Morgan is not a valid comparator for Mr. Lewis.

### 3. David George

On August 1, 2018, David George, who is white, drove his forklift too close to a grinder stand and broke a mirror on his forklift. Doc. 34-5 at 39–40; Doc. 34-6 at 65. Ms. McLaren did not investigate the incident. Doc. 34-5 at 39. Mr. George was not terminated in relation to this incident; he was given the opportunity to be recertified. Doc. 34-6 at 65. The Incident/Accident Investigation Form documenting Mr. George's forklift incident provides that he "was given [a] drug test and removed from driving lift until he has been re-certified." *Id.*  That form was signed by Mr. George's supervisor, Bill Allen, and states that Mr. George was a material handler at the time of the incident. *Id.*

Mr. Lewis asserts that Mr. George "was operating a forklift in an unsafe manner and [that] the misconduct is similar in nature to the conduct cited for Lewis's termination." Doc. 41 at 31. He further asserts that "[d]espite the Safety Rules indicating this act is a safety violation . . . , George's incident was considered accidental, and he was recertified." *Id.* (citing Hubbell's Safety Rule II.b.(7)). Mr. Lewis asserts that Mr. George "was treated more favorably than Lewis because Lewis was not offered the same opportunity to be recertified, and in fact was terminated." *Id.*

Mr. George is not a valid comparator for Mr. Lewis for the same reasons that Mr. McCombs and Mr. Morgan are not valid comparators. Mr. Lewis has not established that he was subjected to the same rule or policy that was applied to Mr. George; the documentation memorializing Mr. George's forklift incident does not reference a specific rule or policy that was violated, and Mr. Lewis has not provided any other evidence of the specific policy applied to Mr. George.

Mr. Lewis's and Mr. George's misconduct is similar in that they were both involved in forklift incidents, but the facts underlying those forklift incidents are dissimilar. Mr. Lewis's misconduct involved transporting more containers on his forklift than is permitted by Hubbell's Safety Rules, as well as his forklift contacting a forklift that was in use by another employee. Mr. George's misconduct involved his forklift's mirror contacting a grinder stand, resulting in a broken mirror.

Although the record reflects that both Mr. Lewis and Mr. George operated forklifts and each received only one disciplinary notice for their respective forklift incidents, Mr. Lewis has not shown that he and Mr. George shared the same employment and disciplinary history. For example, Mr. Lewis and Mr. George were not in the same department—Mr. Lewis was part of the BMM Molding Department and held a group leader position at the time of his forklift incident, *see* Doc. 34-2 at 108, and Mr. George was a material handler at the time of his forklift incident, *see* Doc. 34-6 at 65.

28

Finally, Mr. Lewis and Mr. George also did not share the same supervisors. Mr. Hernandez was Mr. Lewis's supervisor, Ms. DeFanti and Mr. Quinn suspended Mr. Lewis, and Ms. McLaren discharged Mr. Lewis. Doc. 34-1 at 22, 26, 33–34; Doc. 34-5 at 16. Conversely, Ms. McLaren did not investigate Mr. George's forklift incident, nor did she did not have any personal knowledge of the incident. Unlike Mr. Lewis, Mr. George's supervisor at the time was Bill Allen. Accordingly, Mr. George is not a valid comparator for Mr. Lewis. *See Jones*, 874 F.2d at 1542; *Holley*, 845 F. App'x at 889.

### 4. Stacy Williams and Gerard Burdette[1]

Mr. Lewis alleges that Stacy Williams, who is white, had a forklift incident where she hit a restroom door with her forklift and was given the opportunity to be recertified instead of terminated. Doc. 1 ¶ 26; Doc. 34-1 at 49; Doc. 34-5 at 18. Hubbell has no documentation of this incident. Doc. 51 ¶ 37; Doc. 41 ¶ 37. Ms. McLaren testified that she had no knowledge of any such incident. Doc. 34-5 at 18, 25. Further, Mr. Lewis alleges that Mr. Burdette, who is white, knocked down an air-conditioning and ventilation system with his forklift but was not terminated. Doc. 34-1 at 27–28. Hubbell has no record of any forklift incident involving Mr. Burdette.

---

[1] Mr. Burdette has been identified on the record as "Gerard," "Gerrard," and "Jarrod." *See* Doc. 34-1 at 27; Doc. 34-5 at 19; Doc. 41 ¶ 82.

Doc. 51 ¶ 36; Doc. 41 ¶ 36. Ms. McLaren testified that she was unaware of any such incident. Doc. 34-5 at 19, 25, 39.

Mr. Lewis's only reference to either Ms. Williams or Mr. Burdette in his response is to assert that they "have forklift incidents that received no investigation or disciplinary action, and were instead recertified on the forklift." Doc. 41 at 32. Mr. Lewis does not offer any evidence (other than his own testimony) to establish that these two proffered comparators are similarly situated. *See* Doc. 34-1 at 27–28, 40, 49.

## IV.    CONCLUSION

Although Mr. Lewis and each of his proffered comparators were involved in forklift incidents, none of the comparators' incidents involved transporting loads that were too large, nor did the comparators' forklifts contact another forklift that was being driven by another employee. Additionally, other than Mr. McCombs, none of the proffered comparators shared the same supervisors as Mr. Lewis. Moreover, none of the supervisors that Mr. Lewis shared with Mr. McCombs played an active role in Hubbell's response to Mr. Lewis's forklift incident, and none of the supervisors that were the decisionmakers regarding Mr. Lewis's suspension and termination had personal knowledge of or were involved in Hubbell's response to Mr. McCombs's forklift incidents. Accordingly, the court finds that Mr. Lewis has

not met his initial burden of establishing that he and his proffered comparators are "similarly situated in all material respects." *Lewis*, 918 F.3d at 1229.

For the foregoing reasons, Hubbell established "that there is no genuine dispute as to any material fact and [that Hubbell] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Accordingly, Hubbell's motion for summary judgment, Doc. 32, is **GRANTED**.

**DONE** and **ORDERED** this 11th day of June, 2021.

_____

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE